WESTCOTT WILKIN and others *vs.* CITY OF ST. PAUL and others.

| 33 | 181 |
| 40 | 228 |

## February 5, 1885.

City of St. Paul — Streets — Erection of Bridge — Change of Grade — Injunction.—The defendants purpose to construct along and over the southerly 36 feet in width of Third street, in the city of St. Paul, a bridge or structure 20 feet high above the established grade of the street, across the track of the railroad companies, defendants, with ascending approaches at the ends, and to close and keep closed to travel, except over the bridge, that part of the street between its two ends. *Held,* that this will operate to alter the actual travelled grade along that part of the street; and further, that this cannot lawfully be done without altering the established grade in the manner provided in the charter of the city; and further, that, until the established grade is so altered, an owner of a lot injured by the change in the actual travelled grade may have an injunction to restrain the acts of defendants pending an action for a permanent injunction.

Appeal by defendants from an order of the district court for Ramsey county, *Lochren,* J., presiding, (acting for the judges of the second district,) refusing to dissolve an injunction.

The injunction was granted upon the verified complaint, and an affidavit, setting out the contract (mentioned below) between the city and the other defendants (railway companies) for the building of a bridge on Third street, in St. Paul, over the tracks of those companies.

The complaint, contract, and verified answer show the following state of facts: The plaintiffs are severally the owners of lots abutting on the north side of Third street, near to and on both sides of the place where that street crosses the tracks of the railway companies. The street is one of the principal thoroughfares in the city, crosses the tracks at grade, and at the place of crossing, and on both sides of it, in front of plaintiffs' lots, the grade of the street had been legally established, pursuant to the city charter, long prior to March 8, 1884. On that day the city made a contract with the railway companies, whereby they agreed to construct, upon the southerly portion of Third

street, and over the tracks, an iron bridge, with a roadway 24 feet wide, and 20 feet above the present grade of the street, and with projecting sidewalks, six feet wide on each side of the main structure, the whole to cover 36 feet of the street, (which is 66 feet wide,) leaving the north 30 feet uncovered and unoccupied. On its part the city agreed to construct and maintain, in front of plaintiffs' lots, approaches to the bridge, with roadways leading up to the roadway of the bridge, and also to close and keep closed to travel that part of the street between the ends of the bridge except on the bridge. The contract also provided for the future widening of the bridge (if necessary) to the width of the street.

If the bridge and approaches are constructed, the roadway for public travel in front of plaintiffs' lots will be raised several feet above the established grade of the street, and the travel along the street will be diverted from the northerly side of it and made to pass over the bridge, which will be equivalent to vacating that part of the street on which plaintiffs' property abuts. Plaintiffs' lots are valuable for business purposes, and will be greatly depreciated in value if the proposed changes are made. No steps have been taken to ascertain or pay the damages that the plaintiffs will thereby sustain, the city denying their right to any compensation. The defendants intend to and will build the bridge and approaches, as provided by their contract, unless restrained by injunction.

*H. J. Horn, W. P. Murray,* and *W. D. Cornish,* for appellants.

*Gordon E. Cole,* for respondents.

GILFILLAN, C. J. The charter of the city of St. Paul, unlike those of many cities, has always given to the owner of any lots injured by an alteration in the previously-established grade of a street a right to compensation for the injury so caused. In the original charter no mode of altering an established grade, or for ascertaining the damages to lots, was prescribed. Laws 1854, *c.* 6, *subc.* 10, § 15. No notice to lot-owners of the proceedings to change a grade, nor opportunity to be heard, either on the matter of the change or of the damages, was given. The lot-owner was left to his action against the city to recover the damages. In the revision of the charter in 1868, it was provided (Sp. Laws 1868, *c.* 26, *subc.* 8, § 12) that notice of

an order altering an established grade should be published in the official paper of the city; that a lot-owner, feeling aggrieved, might, within 20 days after such publication, appeal from the order to the district court; and that on the appeal the court might determine the necessity and expediency of the alteration. The provision as to damages to lots was left as previously existing. In the revision of 1874 (Sp. Laws 1874, c. 1) it was provided that notice of the time and place for considering the proposed alteration should be published in the official paper twice a week for three successive weeks, and that a vote of two-thirds of all the members elect of the council should be required to order the alteration. The provisions as to publishing notice of the order, and the right of appeal to the district court were preserved, and a new one added, to the effect that after the alteration should be finally determined, it should be referred to the board of public works to assess the damages to property caused by the alteration, and the owner was given a right of appeal from the assessment to the district court. Sp. Laws 1874, c. 1, subc. 7, title 3. In 1877 it was provided (Sp. Laws 1877, c. 23, § 9) that the damages for an alteration of grade, allowed by the charter, should be construed to be recoverable only under the provisions of said title 3 of chapter 7 of the charter of 1874.

We have referred in detail to these provisions of the charter to show how carefully the right given in the first charter to compensation for injuries to lots, resulting from an alteration in an established grade, has, through the various changes in the charter, been preserved; and also the care that was eventually found necessary to guard against improvident and unnecessary alterations in grades once legally established. They were inserted, not only to protect the interests of the city and the public, but also the rights accorded to owners of lots. The provision for an assessment of damages by the board of public works was inserted for the benefit of the city, and the design was to have all claims for damages for alterations in grades speedily determined, instead of being left till it might suit the convenience of owners to bring their actions. Others were inserted for the benefit of lot-owners; among them, that intending that before any grade shall be altered, the owners of lots likely to be affected shall

have an opportunity to be heard on the question whether the alteration shall be made. The owners of lots have as much right to that opportunity as to compensation for damages done to their lots. So that if a wrong is threatened against these plaintiffs by the city proceeding in disregard of the provisions in the charter, actions for damages (assuming that they will lie) after the wrong has been perpetrated will not be an adequate remedy, for the recovery of damages would still leave them deprived of a right given them by the charter.

And this is also an answer to the suggestion that courts exercise great caution in respect to granting preliminary injunctions restraining works of public improvement. For, where the plaintiff will otherwise be without adequate remedy, the injunction will issue, however important to the public the improvement may be.

The charter provisions prescribing how an alteration in an established grade shall be made, operate to prohibit the making of an alteration in any other way. The prohibition is for the protection of lot-owners. An actual permanent alteration in the grade,—an alteration, in fact, made merely by raising the surface of the street above or sinking it below the established grade,—though done illegally, would probably operate as injuriously upon property as would an alteration made pursuant to the provisions of the charter. If the effect of the structure contemplated in this case will be to make the grade of the structure the actual practical grade of the street, on which all public travel must go, it will be small consolation to plaintiffs to know that such grade is not the legal one, but that underneath it, at depths varying from one to twenty feet, there is a legal theoretical grade which has not been legally altered, but which no one can use. If the structure will bring about an actual permanent alteration in the grade of the street as such grade was established, the provisions of the charter for alteration of street grades must be complied with before it can lawfully be done. Taking the grade of a street, as the term is used in the charter, to be the line or lines of elevation on which public travel by vehicles and on foot is to pass, there can be very little question that the contemplated work is intended to and will change the actual grade—the publicly travelled grade—by raising it for part of the length of the work 20 feet above the former grade, and reach-

ing that height by an ascending grade at each end; the work for its entire length being above the established grade. Whether the approaches to the principal structure be made by filling in with earth, or by bridging supported by masonry or posts, it must be inevitable that the use as a street on the established grade on that portion covered by the bridge and its approaches will be practically closed. The structure is intended to cover at first the southerly 36 feet in width of the street, and eventually, if the common council shall so elect, the entire width of it. In the contract between the city and the other defendants, the former stipulates "to close and keep closed to travel, except on said bridge, so much of Third street as lies between the eastern and western terminus of the bridge;" in effect, to make the grade of the bridge, and, necessarily, of the approaches to it, the travelled street grade between the two ends of the work. It is evident that the work, and the use by the public of the grade furnished by it, instead of the former grade of the street, is intended to be permanent. It is of no moment, as affects the question here involved, (though it might affect the question of the amount of damages,) that between the work as at first to be constructed and the plaintiffs' lots there will be left a strip—a sort of blind alley—on the former grade, over which they may have access to their lots. Until vacated or the grade altered pursuant to law, they are entitled to the advantage to their lots of the entire width of the street on the established grade.

Order affirmed.